STATE of North Dakota, Plaintiff-Appellee,

v.

Roger T. ERICKSON, Defendant-Appellant.

Cr. No. 548.

Supreme Court of North Dakota.

May 12, 1976.

Benjamin C. Pulkrabek, Mandan, for defendant and appellant.

John M. Olson, State's Atty., and Robert P. Bennett, Asst. State's Atty., Bismarck, for plaintiff and appellee.

SAND, Judge.

Roger Erickson, the defendant, appellant, was charged with negligent homicide in an automobile accident which resulted in the deaths of two men. He was found guilty of the charge and was sentenced to two years at the North Dakota Penitentiary. Defendant moved for a new trial, which was denied. He now appeals from the judgment of conviction and from the order denying a new trial. The grounds stated for a new trial are substantially the same as those claimed as error on this appeal.

Some time between the hours of 11:30 p. m. on April 27, 1974, and 12:05 a. m. on April 28, an accident occurred on old Highway 10 in Burleigh County, three miles east of Driscoll, North Dakota, involving a pickup truck driven by the defendant, Roger Erickson, and a car occupied by two other men. As a result of the accident the two men in the other car were killed, and Roger Erickson and Thomas Adams, a passenger in the pickup, were injured. The defendant, in an unconscious condition, was brought to a hospital in Bismarck. On June 26, 1974, Roger Erickson was charged with the negligent homicide of the two men and was bound over to the Burleigh County district court on July 12, 1974. No trial date was set at that time. On September 23, 1974, the defendant made a motion for a change of judge, which was granted. On April 29, 1975, the defendant moved for dismissal of the charge against him on the ground that he had been denied a speedy trial. The court denied this motion. Trial on the merits began on October 13, 1975, and resulted in the conviction of the defendant by the jury.

The defendant claimed, alleged, and argued that the trial court committed reversible error as follows, which he claims entitles him to have the verdict against him set aside or in the alternative be granted a new trial:

1. Failure to grant defendant's motion of dismissal for lack of speedy trial.
2. Improper instructions to the jury on the essential elements of the offense.
3. Giving improper instructions on the operation of a motor vehicle.
4. That the jury instructions entitled "Under the Influence of Intoxicating Liquor" were improper.
5. That the trial court erred by not ruling that the State had not made a good faith effort to locate Tom Adams, a witness.
6. The trial court committed error by permitting the preliminary testimony of Thomas Adams to be used at the trial and by refusing defense counsel's objection to such testimony at the trial.
7. That the trial court committed error by not granting motion to suppress the evidence as relating to the blood sample which the defendant claimed was taken improperly and not in accordance with the provisions of Chapter 39–20 because the defendant at the time had not been arrested.
8. The trial court committed error in not recognizing or applying the physician-patient privilege and denying the admission of the blood test.
9. The trial court committed error in allowing the admission of the blood test which the defendant claimed was made without first laying the necessary foundation test, as set out in *Salhus*. [*State v. Salhus*, 220 N.W.2d 852 (N.D.1974)]
10. That the evidence presented at the trial was insufficient to justify the jury's verdict of guilty.
11. That the trial court erred in denying his motion for a new trial.

A number of these errors are inter-related and do not require a separate discussion and disposition. We have grouped the alleged errors under appropriate headings.

## I. SPEEDY TRIAL

The defendant's first contention is that he was denied his constitutional right to a speedy trial. A chronological look at the proceedings will be helpful for a determination of this question.

The defendant was charged with negligent homicide on June 26, 1974. On September 23, 1974, the defendant demanded a change of judge. This change was granted on September 30. On October 3 the State made a request for a change of judge. This request was granted on October 8. As a result of the designation of the new trial judge, who had at that date already scheduled his time for the Fall term, the defendant's case could not be included in the Fall 1974 term of the court. The defendant was arraigned on January 16, 1975. He made no demand for a speedy trial at that time. By motion dated March 10, the State made a demand for a speedy trial. On April 29, 1975, the defendant made several motions before the district court. These included a motion to dismiss based upon the denial of a right to a speedy trial, a motion to appoint Benjamin Pulkrabek as attorney for the defendant, a motion for discovery, a motion to suppress evidence, and a motion for independent chemical analysis of a blood sample taken from the defendant. As a result of these motions, specifically the motion for an independent chemical analysis of the blood sample, the defendant's case was further delayed. It was subsequently placed on the Fall 1975 jury term and was tried on October 13, 1975.

The Sixth Amendment of the United States Constitution guarantees the right to a speedy trial. Rule 48(b), North Dakota Rules of Criminal Procedure, acts as a vehicle for enforcing this constitutional right. It states:

"If there is unnecessary delay in presenting the charge to a grand jury or in filing an information or complaint against a defendant who has been arrested or for whose arrest a warrant has been issued, or if there is unnecessary delay in bringing a defendant to trial, the court may dismiss the indictment, information, or complaint."

■ Under Rule 48(b), NDRCrimP, the court can dismiss whenever there has been unnecessary delay without being required to decide whether the unnecessary delay was of such a nature as to deprive the defendant of a constitutional right. Explanatory Note, Rule 48, Dismissal, North Dakota Rules of Criminal Procedure.

The North Dakota Supreme Court stated in *Morris v. McGee*, 180 N.W.2d 659 (N.D. 1970), following *Dickey v. State of Florida*, 398 U.S. 30, 90 S.Ct. 1564, 25 L.Ed.2d 26 (1970), that "consideration must be given to at least three basic factors in judging the reasonableness of a particular delay: the source of the delay, the reasons for it, and whether the delay prejudiced interests protected by the speedy-trial clauses" of the Federal and State Constitutions.

■ The United States Supreme Court added a further consideration in *Barker v. Wingo*, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972). The Court there stated that the approach to be taken in a speedy-trial claim is a balancing test. It stated that there were four factors to be assessed in determining whether a defendant has been deprived of his right to a speedy trial. These are: length of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant. After discussing these items, the Court said:

"We regard none of the four factors identified above as either a necessary or sufficient condition to the finding of a deprivation of the right of speedy trial. Rather, they are related factors and must be considered together with such other circumstances as may be relevant. In sum, these factors have no talismanic qualities; courts must still engage in a difficult and sensitive balancing process. But, because we are dealing with a fundamental right of the accused, this process must be carried out with full recognition that the accused's interest in a speedy trial is specifically affirmed in the Constitution."

The United States Supreme Court in *Moore v. Arizona*, 414 U.S. 25, 94 S.Ct. 188, 38 L.Ed.2d 183 (1973), stated that a petition for a writ of habeas corpus alleging lack of a speedy trial could not be denied simply because the defendant did not show prejudice from the delay. It held that all four factors of *Barker* must be looked at. The state district court, in denying the petition for a writ of habeas corpus, simply stated that the defendant established that there was an eight-month delay in his being brought to trial but did not establish that the delay prejudiced him. The denial was affirmed by the Arizona Supreme Court, and reversed by the United States Supreme Court for the above stated reasons.

The defendant in the instant case contends that under *Moore* and *Barker, supra,* the district court failed to apply the proper standards in denying the motion for dismissal and that the case must be remanded for a proper determination.

 An examination of the record fails to show that defendant was denied any constitutional right. Defendant made no demand for a speedy trial. We cannot find that the defendant was prejudiced by the delay. He was not incarcerated during the period. His motions of April 29 show that he was not ready to go to trial at that date. He made no demand that he be brought to trial. The transcript does not show any loss of memory by any witness on any material question. The prosecution was unable to locate one witness, but his testimony was presented to the jury by use of a preliminary hearing transcript.

There was a delay of some time but this was not the result of any attempt by the State to delay trial for the purpose of hampering defendant's defense. Both sides requested changes of judges which resulted in the case being kept off the 1974 Fall calendar. Defendant made motions on April 29, 1975, which indicated he was not ready to proceed to trial on that date and which resulted in delay of the trial to the Fall Term of 1975.

Under the standard set out by the United States Supreme Court as stated in *Moore* and *Barker, supra,* we find that defendant was not deprived of his constitutional right to a speedy trial. Under the circumstances, the trial moved along expeditiously. Neither speed nor length of time involved separately is controlling.

## II. JURY INSTRUCTIONS

The defendant alleges that the trial court erred in three instances in the instructions which were given to the jury.

 The first instruction the defendant attacks is that dealing with essential elements of the offense, which is set forth as NDJI 1919. It reads:

"The crime of Negligent Homicide may be committed by the driving of a motor vehicle under various circumstances. In this case the State has charged in the information that the crime of Negligent Homicide was committed in one or more of three situations; that is, that the defendant drove a motor vehicle (1) while under the influence of intoxicating liquor; (2) on the left center of the roadway; (3) at an unsafe speed.

"The burden of proof resting upon the State is satisfied only if the evidence shows, beyond a reasonable doubt, the following essential elements of the offense charged:

"(1) That on or about the 27th day of April, 1975, in Burleigh County, North Dakota, the defendant, Roger T. Erickson, drove a motor vehicle under one or more of the foregoing circumstances; and

"(2) That he did so in willful or reckless disregard of the safety of others; and

"(3) That the death of one Bruce Rohrich, a human being, and Mark Abbott, a human being, ensued within one year, as a proximate result of injury received by reason of such driving; and,

"(4) That such homicide was not committed under circumstances constituting 'excusable homicide' or 'justifiable homicide.'"

The crime of negligent homicide is defined by § 12–27–35, North Dakota Century Code, as:

"When the death of any person ensues within one year as a proximate result of injury received by the driving of any vehicle in reckless disregard of the safety of others, the person so operating such vehicle shall be guilty of negligent homicide."

The defendant claims that as the three situations included in the instructions (i. e., driving while under the influence of intoxicating liquor, on the left center of the roadway, and at an unsafe speed) are not elements of the offense of negligent homicide their inclusion could mislead the jury as to what the actual elements of the offense are.

In determining whether a jury instruction is misleading, the instruction as a whole must be considered. *State v. Steele,* 211 N.W.2d 855 (N.D.1973); *State v. Williams,* 150 N.W.2d 844 (N.D.1967). This court stated in *Williams, supra,* syllabus paragraph 3:

"Instructions must be considered as a whole, and if when so considered, they correctly advise the jury as to the law, it is sufficient, although a portion thereof standing alone may be insufficient or erroneous."

In *State v. Steele, supra,* the defendant was charged with negligent homicide. The instruction set out four "situations" similar to the three present here. It stated that because any of the four situations could have been found by the jury to constitute driving a motor vehicle in reckless disregard of the safety of others, which is an essential element of the offense, the jury would not be misled by their inclusion.

The trial court in this case specifically set forth the essential elements of the offense in addition to the three acts of misconduct. It is clear that the court did charge the jury that they must find as an element of the offense that the defendant did drive a vehicle in reckless disregard of the safety of others under one or more of the three situations. Taken as a whole, the instruction is clear and is not misleading.

The second instruction that the defendant objects to is entitled "Operation of a Motor Vehicle" and is taken from NDJI 200. It reads:

"It is unlawful for any person to drive a vehicle upon a highway carelessly and heedlessly in willful or wanton disregard of the rights or safety of others and without due caution and circumspection or to drive the vehicle at a speed or in a manner so as to endanger or be likely to endanger the life, limb, or property of any person. He must drive the vehicle at a careful and prudent speed not greater than is reasonable and proper, having due regard to the traffic, surface, and width of the highway and any other conditions then existing.

"No person shall drive or be in actual physical control of any vehicle upon a highway in this state if he is under the influence of intoxicating liquor."

The defendant claims that this instruction is intended to be used in vehicular tort cases and that the last paragraph is meant to give a basis for a finding of tort liability by finding that the driver was committing a legal wrong. The defendant objects to this because he feels that a jury hearing this instruction would feel that they had to find the defendant guilty of the crime he was charged with if they found he was driving while under the influence, and would fail to consider the "reckless disregard" element of the offense.

Again, taking the instructions as a whole, there is nothing that would be misleading to a jury in this language. The instruction is merely a statement of the law and helps to instruct the jury as to the rules of the road. *See, State v. Sullivan,* 58 N.D. 732, 227 N.W. 230 (1929).

The third instruction which the defendant objects to is entitled "Under the Influence of Intoxicating Liquor," and is taken from NDJI 1901. It reads:

"The phrase 'under the influence of intoxicating liquor' is a flexible term. The mere fact that the driver of a motor vehicle may have consumed intoxicating

liquor does not necessarily render him 'under the influence of intoxicating liquor.' The circumstances and effect must be considered. On the other hand, the driver of a motor vehicle need not be intoxicated or in a state of drunkenness to be 'under the influence of intoxicating liquor.' This expression covers not only all the well-known and easily recognized conditions and degrees of intoxication, but also any abnormal mental or physical condition which is the result of indulging to any degree in intoxicating liquors, and which tends to deprive a driver of the clearness of intellect or control of himself which he would otherwise possess. Accordingly, if intoxicating liquor has affected the nervous system, brain, or muscles of a driver of a motor vehicle so as to impair, to any appreciable degree, his normal ability to operate a motor vehicle, he is 'under the influence of intoxicating liquor.' Whether the defendant was 'under the influence of intoxicating liquor' is a question of fact for you to determine."

The defendant took exception to this instruction on the ground that there was no evidence which indicated that defendant's nervous system, brain, or muscles had been affected by his consumption of alcohol. The defendant contends that by giving the instruction the trial court permitted the jury to speculate on matters which were unsupported by any evidence and that this would prejudice the jury against the defendant.

In *State v. Hendrickson*, 240 N.W.2d 846 (N.D.1976), we said:

"That consumption of alcohol adversely affects judgment, reduces reaction time, dulls reflexes, and diminishes inhibitions is commonly known and accepted, as well as scientifically verified. *See, e. g.,* 2 Schwartz, Trial of Automobile Accident Cases, § 914 (3d ed. 1972)."

We continued by saying:

"Under Section 31–10–02(84), N.D.C.C., the jury and the court were entitled to take notice '[o]f such matters of common knowledge and science as may be known

to all men of ordinary understanding and experience.' "

These statements have full application to the present case. No evidence was introduced which suggests that the defendant in this instance is an exception for whatever reason, nor was any evidence introduced that there are exceptions to this common, accepted fact which could be applied to or inferred on behalf of the defendant.

The question that must be answered is whether the jury could reasonably infer from the evidence presented to it that the defendant was driving while under the influence. Testimony presented at the trial showed that the blood alcohol level of the defendant was 0.23 percent. There was testimony that beer was found in the truck and also that the defendant had been seen drinking in several bars that night. The evidence showed that the defendant had crossed the centerline and hit an oncoming car. This is sufficient evidence to allow a jury to infer that the liquor had affected the defendant to such a degree as to impair his normal ability to operate a motor vehicle. The evidence presented warranted giving the instruction because the question of whether or not the consumption of liquor had affected the defendant was a question of fact in issue for the jury to decide.

## III. WITNESS AND TESTIMONY

The defendant claims that, because of the failure of the State to find a witness, Thomas Adams, he was denied his right to be confronted with the witnesses against him.

Thomas Adams was the other passenger in the pickup truck with the defendant on the night of the accident. At the preliminary hearing, testimony was taken from Adams concerning the events of the evening of the accident. At the time of the trial Adams could not be found, therefore his previously recorded testimony was introduced and admitted in evidence.

All that is required of the State is that it make a reasonable, good faith effort to locate a witness. *Barber v. Page,* 390

U.S. 719, 88 S.Ct. 1318, 20 L.Ed.2d 255 (1968).

Whether or not the State has made a good faith effort to locate a witness is within the discretion of the trial court. *People v. Phillips*, 61 Mich.App. 138, 232 N.W.2d 333 (1975); *Jackson v. State*, 133 Neb. 786, 277 N.W. 92 (1938).

█ The trial court found that the State had made a sufficient effort to find the witness. We find no abuse of discretion by the trial court on this issue.

A subpoena was issued for the appearance of Thomas Adams at the trial. His parents were contacted but did not know where he was. It was learned that Adams worked for a carpet company, so companies in the area were contacted, but this search was unsuccessful. Phone calls were made at ten-minute intervals to a number given to the police by an anonymous caller. When the phone was answered on the second day after the calling began, the police were informed that Adams lived there only occasionally and that his present whereabouts were unknown. A request for information leading to the location of the witness was broadcast over radio and television, but produced no responses. These efforts show a good faith attempt by the police to find Adams. The defendant, who claims he was denied his constitutional right to confront the witnesses against him, made no effort to find Adams. If he believed the cross-examination of this witness would have proved important he should have made some effort to insure the presence of the witness at the trial.

█ The defendant also disputes the trial court's ruling permitting the admission of the prior testimony of the witness (Adams). He claims he did not cross-examine the witness at the hearing because of the nature of the proceeding. This court stated in *State v. Jacob*, 222 N.W.2d 586, 589 (N.D. 1975), that "The key to the admissibility of former testimony of a witness is the unavailability of that witness at the subsequent trial."

This court, in *Jacob, supra,* held that where a witness is unavailable for trial, his testimony at a former trial of the same issue is admissible where there was, at the first trial, adequate opportunity for cross-examination. *State v. McCarty*, 49 N.D. 912, 194 N.W. 335 (1923). If the cross-examination was not as penetrating or extensive as it might have been, it was only because counsel for the defendant chose not to make it so.

On page 590 of *Jacob, supra,* this court said:

"Under these circumstances, where the choice is between receiving relevant testimony which is subject to all the safeguards of reliability or of rejecting it, and losing the only meaningful evidence the State could produce, the ruling of the trial court to admit it was proper."

There was no evidence here that the defendant was restricted in his ability to cross-examine the witness at the prior hearing. He failed to do so on his own volition. Now the witness is not available for cross-examination. This is a risk that the defendant took when he chose not to cross-examine at the prior hearing.

## IV. BLOOD SAMPLE

The defendant raises several issues as to the blood alcohol test which was administered to him.

█ First, he claims that § 39–20–01, NDCC, which is stated as follows, was not properly complied with.

"Any person who operates a motor vehicle upon the public highways of this state shall be deemed to have given consent subject to the provisions of this chapter to a chemical test, or tests, of his blood, breath, saliva, or urine for the purpose of determining the alcoholic content of his blood. The test or tests shall be administered at the direction of a law enforcement officer only after placing such person except persons mentioned in Section 39–20–03 under arrest and informing him that he is or will be charged with the offense of driving or being in actual physical control of a vehicle upon

the public highways while under the influence of intoxicating liquor. The arresting officer shall determine which of the aforesaid tests shall be used."

Section 39–20–03, NDCC, provides:

"Any person who is dead, unconscious or who is otherwise in a condition rendering him incapable of refusal, shall be deemed not to have withdrawn the consent provided by section 39–20–01 and the test or tests may be given."

The defendant argues that this "implied consent" statute only applies to persons who have been charged with or are going to be charged with driving a motor vehicle while under the influence of intoxicating liquor. He claims because he was not charged with driving while under the influence, but with negligent homicide, the statute does not apply to him.

This court stated in *Timm v. State*, 110 N.W.2d 359, 364 (N.D.1961), that:

"The object of the Legislature in enacting Section 39–20–01 was clearly to determine the alcoholic content of the blood of persons who are suspected of operating motor vehicles upon the public highways while under the influence of intoxicating beverages."

Although the defendant was never charged with the specific crime of driving while under the influence, a finding that he was under the influence was one of the alternate essential elements for finding that he was driving "in reckless disregard of the safety of others" and was guilty of negligent homicide.

Section 39–20–07, NDCC, states that evidence of the amount of alcohol in a person's blood is admissible "upon the trial of *any* civil or criminal action or proceeding arising out of acts alleged to have been committed by any person while driving or in actual physical control of a motor vehicle while under the influence of intoxicating liquor." [Emphasis added.]

The defendant's argument completely disregards the provisions of § 39–20–03, NDCC, which is an exception to § 39–20–01, NDCC. The evidence discloses that the defendant was unconscious at the time the blood samples were taken. It is difficult to understand how an unconscious person can be made aware of an arrest or charge, or how he may give or withdraw consent. The law recognizes this, therefore the exception. The defendant's argument in this respect is without merit.

The defendant also claims that the results of the blood test should be barred by reason of his assertion of a physician-patient privilege.

Section 31–01–06(3), NDCC, states:

"A person cannot be examined as a witness in the following cases:

. . . . .

"3. A physician or surgeon, without the consent of his patient, cannot be examined as to any information acquired in attending the patient or as to any communication made by the patient to him in the course of professional employment;"

Upon arrival at the hospital following the accident, the defendant was attended by Dr. Scott Girard, who was on duty. The law enforcement officials, by radio, directed that blood samples be taken. Two blood samples were taken from the defendant by the medical technologist, one to comply with the request of the police and the other presumably for the doctor. The sample drawn pursuant to Chapter 39–20, NDCC, was not taken for purposes of diagnosis or treatment but only for the purpose of the implied consent statute.

It has been held that a blood sample secured pursuant to an implied consent statute is not "information," within the purposes of a physician-patient privilege statute and, therefore, will not be excluded when the privilege is invoked. Because the sample is taken only for blood alcohol tests and not for diagnosis or treatment of the person, the privilege does not apply. *State v. Staker*, 220 N.W.2d 613 (Iowa 1974); *State v. Bedel*, 193 N.W.2d 121 (Iowa 1971); *Hanlon v. Woodhouse*, 113 Colo. 504, 160 P.2d 998 (1945). In *State v. District Court of Iowa, In and For Linn County*, 218

N.W.2d 641 (Iowa 1974), the court recognized that a physician might serve a dual function: to treat the defendant and to perform an act pursuant to the implied consent law.

Case law clearly shows that no physician-patient privilege is involved in taking a blood sample for the purposes of a blood alcohol test.

 The defendant claims that the test of his blood was not properly administered.

Section 39–20–07, NDCC, sets forth what is required before the results of a blood test will be admitted to evidence. Paragraph 5 of that section requires a showing that the test was fairly administered. It is claimed that the test in this case was not fairly administered because the test operator had not conducted a spot check to determine if the "known solution" did contain what it was supposed to.

The defendant cites the North Dakota case of *State v. Salhus*, 220 N.W.2d 852 (N.D.1974), in support of his argument. The court held there that the results of a Breathalyzer test were improperly admitted into evidence because of a failure to show that the test was fairly administered. In *Salhus*, the police officer who had administered the Breathalyzer test testified that he had tested the Breathalyzer machine by using a known solution. However, the police officer had not personally spot-checked any of the ampules of the known solution so he could not say whether the ampules did in fact contain what they were supposed to.

In this case the trial court met the defendant's objection to the testimony of the "operator" by saying there was a distinction between a police officer and a laboratory technician and stated that *Salhus* applied only to laymen operating alcohol detection devices, and not to "experts." We agree.

The gas chromatograph used in blood alcohol tests is a much more complex machine than that used in Breathalyzer tests and requires a greater competence for its operation. Little training is required to operate a Breathalyzer as the operator need only go down a checklist of steps. The operators of the gas chromatograph in laboratories are experts in the identification of solutions used in the chromatograph. The operator testified as to the procedure she used in testing the blood sample. She stated that, though she did not run a spot check of the known solution, that it behaved as the solution normally behaved.

The tests questioned here were performed by a laboratory technician in a controlled environment under the supervision and direction of the State Toxicologist, a State officer, who, pursuant to § 15–12–21, NDCC, is charged with the duty and responsibility of providing toxicological services, which includes testing blood for alcohol content. The test here was not performed under field conditions or by a layman, as was the situation in *Salhus*.

We believe a laboratory technician performing a service under the supervision and direction of the State Toxicologist is performing an official act which is entitled to a disputable presumption of regularity pursuant to § 31–11–03(15), NDCC, until contradicted by other evidence. *State v. Berger*, 148 N.W.2d 331 (N.D.1966); *Fancher v. North Dakota Workmen's Compensation Bureau*, 123 N.W.2d 105 (N.D.1963). No contradictory evidence was introduced. Therefore, the presumption stands.

## V. EVIDENCE

The defendant was charged with negligent homicide in the deaths of two men. The provisions of § 12–27–35, NDCC, defining negligent homicide have been set out earlier herein.

The defendant claims that the evidence introduced at the trial was insufficient to convict him of the crime of negligent homicide.

The State charged in the information that the crime was committed willfully and unlawfully by defendant by operating the motor vehicle in reckless disregard of the safety of others (1) while under the influence of intoxicating liquor, (2) on the left center of the roadway, and (3) at an unsafe speed.

The State presented the results of the blood alcohol test, which showed that the defendant had 0.23 percent alcohol in his blood. There was testimony from Thomas Adams and Darrel Erickson, witnesses, that defendant had been seen drinking in several bars. The defendant also admitted himself that he had been drinking the evening before.

The testimony as to the position of the cars was that defendant had crossed the centerline and hit the oncoming car. The point of impact of the vehicles, the location of the vehicles after the collision, and the fact that considerable debris and dirt was found in the westbound, or victims' lane, and also underneath the automobile, is consistent with this conclusion that the defendant had crossed into the oncoming lane and struck the automobile of the victims.

There was testimony from both the defendant and the passenger, Thomas Adams, that the defendant was driving 50 to 55 miles per hour. The fact that this speed is within the legal limits does not mean that it is not an "unsafe speed." This court stated in *State v. Steele, supra,* 211 N.W.2d 864:

"When the person in actual physical control of a motor vehicle is under the influence of intoxicating liquor the speed at which he drives may be 'unsafe' even though below the limit prescribed by law."

The fact that the defendant was under the influence and crossed the centerline show that his speed was unsafe for the condition he was in.

The jury could conclude from the evidence that the defendant was driving while under the influence, on the left side of the center of the roadway, and at an unsafe speed, and from this that he was driving in reckless disregard of the safety of others.

In *State v. Berger,* 234 N.W.2d 6, 12 (N.D.1975), we said:

"In reviewing the verdict of a jury to determine whether the evidence is sufficient to establish guilt beyond a reasonable doubt, our duty is to determine whether substantial evidence supports the verdict. *State v. Steele,* 211 N.W.2d 855, 870 (N.D.1973). *See also, State v. DePriest, supra,* 206 N.W.2d at 865; *State v. Champagne,* 198 N.W.2d 218, 226 (N.D.1972); *State v. Ankney,* 195 N.W.2d 547, 550–551 (N.D.1972); and *State v. Carroll,* 123 N.W.2d 659, 668 (N.D.1963). In summary, 'at the appellate level we do not substitute our judgment for that of the jury or trial court where the evidence is conflicting, if one of the conflicting inferences reasonably tends to prove guilt and fairly warrants a conviction.' *State v. Kaloustian,* 212 N.W.2d 843, 845 (N.D. 1973)."

A portion of this was also restated in *State v. Berger,* 235 N.W.2d 254 (N.D. 1975), to the effect that this court on the appellate level does not substitute its judgment for that of the jury or the trial court where the evidence is conflicting if one of the conflicting inferences tends to prove guilt and fairly warrants a conviction. This principle of law has full application to the contention here that the evidence is insufficient. Earlier, we have pointed out the evidence which the jury could have relied upon in reaching its conclusion. This evidence is substantial. We do not find this contention meritorious.

The defendant also contends that there was not one piece of circumstantial evidence which would allow the jury to conclude beyond a reasonable doubt that he was guilty of the crime charged. The defendant is obviously disregarding the testimony with reference to the debris and dirt that was found in the westbound, or victims', lane and also underneath the automobile, which is consistent with the finding that the defendant had crossed into the oncoming lane and drove at least to some degree in the "left" lane.

We said, in *State v. Holy Bull,* 238 N.W.2d 52 (N.D.1975), that circumstantial evidence may be used to establish guilt and is considered competent evidence and that any fact may be proved by either

direct evidence or circumstantial evidence, or both.

In *State v. Allen*, 237 N.W.2d 154 (N.D.1975), we said that a verdict based on circumstantial evidence carries the same presumption of correctness as other verdicts and will not be disturbed unless wholly unwarranted even though the evidence is weak and unsatisfactory to the appellate court.

The contention of the defendant as to circumstantial evidence is without merit.

The judgment of conviction and order of the trial court denying motion for new trial are affirmed.

ERICKSTAD, C. J., and PAULSON, PEDERSON and VOGEL, JJ., concur.